**UNITED STATES, Appellee,**

v.

**Eric FLORES–RIVERA, Defendant–Appellant.**

**No. 93–1558.**

United States Court of Appeals,
First Circuit.

Heard Jan. 9, 1995.

Decided June 1, 1995.

---

Robert G. Levitt, Denver, CO, for appellant.

David S. Kris, Atty., U.S. Dept. of Justice, with whom Guillermo Gil, U.S. Atty., Washington, DC and Salixto Medina–Malavé, Asst. U.S. Atty., Hato Rey, PR, were on brief, for appellee.

Before TORRUELLA, Chief Judge, SELYA and STAHL, Circuit Judges.

TORRUELLA, Chief Judge.

On April 11, 1991, defendant Eric Flores–Rivera ("Flores–Rivera"), along with seventeen other persons not party to this appeal, was named in a thirty-four-count superseding indictment charging various drug-related offenses. On April 14, 1993, a jury convicted Flores–Rivera on one count of conspiracy to import cocaine and to possess cocaine with intent to distribute it, in violation of 21 U.S.C. §§ 846 and 963 (Count 2), and two counts of assaulting a federal officer with a deadly weapon, in violation of 18 U.S.C. § 111, (Counts 5 and 6). The jury acquitted Flores–Rivera on Counts 3, 4, and 34, which charged importation of cocaine, possession of cocaine with intent to distribute, and use of a communication facility to commit a drug crime, in violation of 21 U.S.C. §§ 952, 841(a)(1), and 843(b), respectively. The district court sentenced Flores–Rivera to 324 months' imprisonment, to be followed by a five-year term of supervised release. Flores–Rivera now appeals. For the following reasons, we affirm.

## I. BACKGROUND

We recite the facts in the light most favorable to the government. *United States v. Echeverri,* 982 F.2d 675, 676 (1st Cir.1993). The focus of this case was a large drug trafficking conspiracy. The conspirators, headed by co-defendant Eusebio Escobar-de Jesús ("Escobar"), worked with members of the Medellín and Cali drug cartels to import cocaine from Colombia into Puerto Rico and New York.

The linchpin witness for the government's case against Flores–Rivera was William Cedrés ("Cedrés"), a confidential informant. Cedrés testified that he infiltrated the con-

spiracy and gained the confidence of Escobar. In 1990, Cedrés became the "number two man" in Escobar's organization. Cedrés testified that Escobar informed him that Flores–Rivera was a member of the organization. Cedrés also testified that Flores–Rivera had accompanied him to the island of Vieques to look for sites where an airplane could land or drop-off kilogram quantities of cocaine in the future. Cedrés indicated that the conspirators were planning to use the new sites to import approximately 1,500 kilograms of cocaine. The Medellín cartel was to supply the cocaine, and the importation was to be divided into four or five shipments.

Cedrés also testified that Escobar had instructed Flores–Rivera to supervise the importation of between 300 and 500 kilograms of cocaine from Colombia. Flores–Rivera was tape recorded discussing the importation plans with Cedrés and Escobar. The tape recording, along with Cedrés' testimony, indicate that Flores–Rivera was to travel to Colombia and return in a boat loaded with cocaine to one of Escobar's properties.

The government also presented evidence of Flores–Rivera's involvement in the April 1986 shooting of two U.S. Customs agents. Two witnesses testified that on April 14, 1986, they saw Flores–Rivera arrive at the Isla Grande Flying School in a yellow, flatbed tanker-truck and purchase over 100 gallons of aviation fuel. Two U.S. Customs agents followed Flores–Rivera as he drove the tanker-truck from the flying school to a farm housing a covert landing strip used by the Escobar organization. From their surveillance post outside the farm, the Customs agents observed Flores–Rivera and codefendant Andrés Morales–Cruz enter the farm. Later that night, the Customs agents saw a small airplane land at the farm. Shortly thereafter, the Customs agents witnessed an unidentified man clad in army fatigues exit the farm in a white van. The Customs agents followed. When the van got to a small curve in the road, it stopped as if to make a U-turn. As the Customs agents tried to drive by, the van's occupants opened fire on them, severely injuring both agents. The agents were never able to identify the attackers.

## II. DISCUSSION

### A. *Sufficiency of the Evidence*

Flores–Rivera contends that the evidence was insufficient to support his convictions for conspiracy and assault on a federal officer.

■■■ The standard of review governing a challenge to the sufficiency of the evidence is well established. An appellate court must determine whether a rational jury could find guilt beyond a reasonable doubt. *Echeverri,* 982 F.2d at 677; *United States v. García,* 983 F.2d 1160, 1163–64 (1st Cir.1993). In making this determination, the reviewing court must examine the evidence, together with all inferences that may be reasonably drawn from it, in the light most favorable to the prosecution. *Echeverri,* 982 F.2d at 677. Furthermore, the reviewing court does not evaluate witness credibility, but resolves all credibility issues in favor of the verdict. *García,* 983 F.2d at 1164 (quoting *United States v. Batista–Polanco,* 927 F.2d 14, 17 (1st Cir.1991)). "The evidence may be entirely circumstantial, and need not exclude every reasonable hypothesis of innocence; that is, the factfinder may decide among reasonable interpretations of the evidence." *Batista–Polanco,* 927 F.2d at 17. Nevertheless, "[i]f the 'evidence viewed in the light most favorable to the verdict gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence of the crime charged,' this court must reverse the conviction. This is so because ... where an equal or nearly equal theory of guilt and a theory of innocence is supported by the evidence viewed in the light most favorable to the prosecution, 'a reasonable jury *must necessarily entertain* a reasonable doubt.'" *United States v. Sánchez,* 961 F.2d 1169, 1173 (5th Cir.) (citations omitted), *cert. denied,* —— U.S. ——, 113 S.Ct. 330, 121 L.Ed.2d 248 (1992). With the scope of our review thus defined, we move to the appellants' claims.

### 1. Conspiracy

■■■ To establish a conspiracy conviction, the prosecution must prove, *inter alia,* that the defendant entered an agreement to

commit the substantive offense, and that the defendant was a voluntary participant in the conspiracy. *Echeverri,* 982 F.2d at 679. The government must prove that the defendant possessed both "an intent to agree and an intent to effectuate the commission of the substantive offense." *United States v. Piper,* 35 F.3d 611, 615 (1st Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1118, 130 L.Ed.2d 1082 (1995). However, "[d]ue to the clandestine nature of criminal conspiracies, the law recognizes that the illegal agreement may be either 'express or tacit' and that a ' "common purpose and plan may be inferred from a development and collocation of circumstance." ' " *United States v. Sánchez,* 917 F.2d 607, 610 (1st Cir.1990) (citations omitted), *cert. denied,* 499 U.S. 977, 111 S.Ct. 1625, 113 L.Ed.2d 722 (1991). "Mere presence at the scene and close association with those involved are insufficient factors alone; nevertheless, they are *relevant* factors for the jury." *Sánchez,* 961 F.2d at 1174 (5th Cir.) (citation omitted).

■ Although he does not dispute the existence of the Escobar drug-trafficking conspiracy, Flores–Rivera maintains that the evidence fails to establish that he was a member. Given that we resolve any credibility issues in favor of the verdict, we find that Flores–Rivera's sufficiency-of-the-evidence challenge fails because the record contains ample support for his conspiracy conviction. A reasonable jury could infer from Cedrés' testimony that Flores–Rivera was deeply involved in the entire operation. Cedrés testified that Flores–Rivera was a member of the Escobar conspiracy, and that Flores–Rivera accompanied him to Vieques to search for appropriate landing sites for drug drop-offs. Moreover, the evidence against Flores–Rivera includes a tape-recorded conversation in which Flores–Rivera discusses importation plans with Escobar and Cedrés. The tape recording also indicates that Flores–Rivera agreed to go to Colombia and return in a boat laden with cocaine. In sum, the evidence demonstrates clearly and convincingly that Flores–Rivera was a knowing and voluntary participant in many aspects of the Escobar drug conspiracy.

### 2. Assault on a federal agent

■ Under the well settled *Pinkerton* doctrine, members of a conspiracy may be held liable for the substantive crimes committed by co-conspirators, provided that the substantive crimes were committed in furtherance of the conspiracy and while the defendant was a member of the conspiracy. *See Pinkerton v. United States,* 328 U.S. 640, 646–48, 66 S.Ct. 1180, 1183–84, 90 L.Ed. 1489 (1946); *United States v. Torres–Maldonado,* 14 F.3d 95, 101 (1st Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 193, 130 L.Ed.2d 125 (1994). Under *Pinkerton,* the government was required to prove that the April 14, 1986, assault on the U.S. Customs agents was carried out by members of the Escobar conspiracy, in furtherance of the conspiracy, and at a time when Flores–Rivera was still a member of the conspiracy. *United States v. Muñoz,* 36 F.3d 1229, 1234 (1st Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1164, 130 L.Ed.2d 1120 (1995). We think it met this burden. The jury heard the following facts: On April 14, 1986, Flores–Rivera brought airplane fuel to a farm housing a covert landing strip operated by the conspirators. While the Customs agents were surveilling the farm, a plane landed at the farm and, shortly thereafter, a man clad in army fatigues exited in a white van. The Customs agents followed the van. The van stopped as if to make a U-turn, and as the Customs agents drove by, they were fired upon by the van's occupants. In these circumstances, a reasonable jury could have found that the shooting was committed by members of the conspiracy, in furtherance of the conspiracy, and while Flores–Rivera was still a member of the conspiracy. Therefore, we find that there was sufficient evidence to convict Flores–Rivera under *Pinkerton* liability for assault on a federal officer.

Accordingly, we reject both of his challenges to the sufficiency of the evidence.

### B. *Separate Trials*

Flores–Rivera alleges that the district court erroneously denied his Rule 14 motion

for severance. *See* Fed.R.Crim.P. 14.[1] We disagree.

The First Circuit law regarding severance is clear:

As a rule, persons who are indicted together should be tried together. This practice helps both to prevent inconsistent verdicts and to conserve resources (judicial and prosecutorial). Thus, when multiple defendants are named in a single indictment, a defendant who seeks a separate trial can ordinarily succeed in obtaining one only by making a strong showing of evident prejudice. The hurdle is intentionally high; recent Supreme Court precedent instructs that "a district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence."

*United States v. O'Bryant,* 998 F.2d 21, 25 (1st Cir.1993) (quoting *Zafiro v. United States,* ── U.S. ──, ──, 113 S.Ct. 933, 938, 122 L.Ed.2d 317 (1993)) (internal citations omitted).

■ The decision to grant or deny a motion for severance is committed to the sound discretion of the trial court and we will reverse its refusal to sever only upon a finding of manifest abuse of discretion. *Zafiro,* ── U.S. at ──, 113 S.Ct. at 938; *United States v. Olivo–Infante,* 938 F.2d 1406, 1409 (1st Cir.1991); *United States v. Natanel,* 938 F.2d 302, 308 (1st Cir.1991), *cert. denied,* 502 U.S. 1079, 112 S.Ct. 986, 117 L.Ed.2d 148 (1992); *United States v. Boylan,* 898 F.2d 230, 246 (1st Cir.1990).

■ Essentially, Flores–Rivera contends that severance was required because of the "spillover" effect of prosecuting him, an alleged minor participant, alongside the major conspirators. That is, Flores–Rivera claims that the joint trial "seriously limited the jury's ability to sift through all the evidence against each individual defendant and increased the risk that the jury would base its

verdicts on evidence which has no bearing on the guilt or innocence of defendants with a more limited involvement in the scheme." *United States v. Brandon,* 17 F.3d 409, 440 (1st Cir.), *cert. denied, Granoff v. United States,* ── U.S. ──, 115 S.Ct. 80, 130 L.Ed.2d 34 (1994). In support of this contention, he points out that he was named in less than ten percent of all the overt acts charged in the indictment and that his alleged role in the conspiracy was significantly less than that of his codefendants. These facts, without more, *do not render severance mandatory.* We rejected this argument in *O'Bryant,* stating:

To be sure, there is some truth to appellant's complaint that a minnow (O'Bryant) and a kingfish (Puleo) stood trial together. It is also true that the prosecution drew a bead on Puleo and aimed most of its ammunition in his direction. But, these truths, without more, did not necessitate a separate trial for O'Bryant. It is well settled that, "[e]ven where large amounts of testimony are irrelevant to one defendant, or where one defendant's involvement in an overall agreement is far less than the involvement of others," the court of appeals must be "reluctant to second guess severance denials." Such reluctance is fully justified here.

*O'Bryant,* 998 F.2d at 26 (quoting *Boylan,* 898 F.2d at 246 (collecting cases)).

■ Moreover, we have held that " '[i]n the context of conspiracy, severance will rarely, if ever, be required.' " *Brandon,* 17 F.3d at 440 (quoting *United States v. Searing,* 984 F.2d 960, 965 (8th Cir.1993)); *see also O'Bryant,* 998 F.2d at 24–26. To convict any of the defendants under a conspiracy theory, the government had to show the existence of an illicit scheme to import and distribute cocaine; and because Flores–Rivera and his codefendants were charged as coconspirators, virtually all the evidence relating to the other conspirators was also directly relevant to, and, therefore, independently admissible in, the prosecution's case

---

1. The rule authorizing motions for severance states in pertinent part: "If it appears that a defendant ... is prejudiced by a joinder ... of defendants ... for trial together, the court may ... grant a severance of defendants, or provide whatever other relief justice requires." Fed. R.Crim.P. 14.

against him. *See O'Bryant,* 998 F.2d at 26 (citing *United States v. Riehl,* 460 F.2d 454, 457–58 (3d Cir.1972)). And as we have held, "[w]here evidence featuring one defendant is independently admissible against a codefendant, the latter cannot convincingly complain of an improper spillover effect." *Id.* (collecting cases).[2] Accordingly, we find that the district court did not abuse its discretion in refusing to grant Flores–Rivera's motion for severance.

### C. Jury Selection

▇▇▇ Defendant asserts two claims regarding jury selection. First, he contends that the "English only" requirement of the jury selection system violates his Fifth and Sixth Amendment rights because it effectively excludes two-thirds of the population of Puerto Rico.[3] This argument is foreclosed by our decision in *United States v. Aponte–Suárez,* in which we held that even if the English-only requirement "[results] in a smaller pool of eligible jurors and a 'systematic exclusion' in the jury selection process, the overwhelming national interest served by the use of English in a United States court justifies conducting proceedings in the District of Puerto Rico in English and requiring jurors to be proficient in that language." 905 F.2d 483, 492 (1st Cir.) (citing *United States v. Benmuhar,* 658 F.2d 14, 19 (1st Cir.1981), *cert. denied,* 457 U.S. 1117, 102 S.Ct. 2927, 73 L.Ed.2d 1328 (1982)), *cert. denied,* 498 U.S. 990, 111 S.Ct. 531, 112 L.Ed.2d 541 (1990). Accordingly, we reject this contention.

Second, Flores–Rivera maintains that the district court did not adequately inquire whether the jurors could speak and understand English as required by 28 U.S.C. § 1865(b)(2) & (3), and that "[p]resumably, there were many … jurors who actually sat on this case who may not have comprehended English." We disagree.

▇▇▇ 28 U.S.C. § 1865(b) requires that jurors be dismissed if they cannot demonstrate a minimum proficiency in English. 28 U.S.C. § 1867 sets forth the proper procedure for challenging the district court's compliance with selection procedures, and requires that the defendant make an appropriate challenge within seven days "after the defendant discovered or could have discovered, by the exercise of diligence, … substantial failure to comply with the provisions of this title in selecting the grand or petit jury." Here, Flores–Rivera did not challenge the English proficiency of the empaneled jurors within the prescribed time frame. In similar cases, we have held that where the defendant failed to raise a timely objection, "later doubts as to a juror's linguistic competence will not constitute grounds for relief without a showing of 'manifest' or 'clear' injustice." *United States v. Nickens,* 955 F.2d 112, 117 (1st Cir.) (collecting cases), *cert. denied,* —— U.S. ——, 113 S.Ct. 108, 121 L.Ed.2d 66 (1992). Flores–Rivera has shown no such injustice. In fact, his bald assertion that "presumably, there were many … jurors who actually sat on this case who may not have comprehended English" is unaccompanied by any support whatsoever. Accordingly, we reject his challenge to the empaneled jury, not only because it was untimely, but also because it is devoid of factual support.[4]

---

2. We also note that the jury acquitted Flores–Rivera on Counts 3, 4, and 34, which charged importation of cocaine, possession of cocaine with intent to distribute, and use of a communication facility to commit a drug crime. This suggests that the jury was able to sift through the evidence in an analytical fashion and that the alleged spillover effect did not cause the jury merely to enter a lump conviction against Flores–Rivera. *See Brandon,* 17 F.3d at 440 (finding acquittals to be a relevant factor in upholding a district court's denial of a severance) (collecting cases).

3. Federal law requires that all grand and petit jurors have the ability to speak English and read, write and understand English with proficiency sufficient to fill out satisfactorily the juror qualification form. 28 U.S.C. § 1865(b)(2) & (3).

4. Flores–Rivera further contends that it was improper for the district court to conduct a portion of its voir dire in Spanish, and that this constitutes reversible error. Flores–Rivera fails to identify any statute or caselaw requiring that the district courts conduct voir dire entirely in English. Moreover, he has not explained how he was prejudiced by the bilingual voir dire, especially in light of the fact that he *requested* that the district court perform its voir dire in Spanish. Consequently, we deem this argument waived. *See United States v. Zannino,* 895 F.2d 1, 17 (1st Cir.) (discussing "the settled appellate rule that issues adverted to in a perfunctory manner, un-

## D. Double Jeopardy

 Flores–Rivera maintains that his conviction for conspiracy to import cocaine and to possess cocaine with intent to distribute cannot stand because it is inconsistent with his acquittal on the substantive crimes charged in the indictment (importation of cocaine, possession of cocaine with intent to distribute, and use of a telephone to facilitate the importation of cocaine).[5] We have addressed similar claims before and found them unavailing. *See, e.g., United States v. González–Torres,* 980 F.2d 788 (1st Cir.1992); *United States v. López,* 944 F.2d 33, 41 (1st Cir.1991). "It is well settled that inconsistency in a criminal verdict does not require setting the verdict aside."[6] *González–Torres,* 980 F.2d at 791 (citing *Dunn v. United States,* 284 U.S. 390, 393–94, 52 S.Ct. 189, 190–91, 76 L.Ed. 356 (1932); *United States v. Powell,* 469 U.S. 57, 69, 105 S.Ct. 471, 479, 83 L.Ed.2d 461 (1984); *United States v. Bucuvalas,* 909 F.2d 593 (1st Cir.1990)). As we explained in *López:*

> Although it may seem inconsistent in this case to convict on the conspiracy charge, and acquit the same defendant on the substantive charge alleged to have been the object of the conspiracy, the Supreme Court has made it clear that verdict incon-

sistency in itself is not a sufficient basis for vacating a conviction.

> Verdict inconsistency does not indicate that the government necessarily failed to prove an essential element of its case beyond a reasonable doubt. We cannot necessarily assume that the acquittal was proper—the one the jury "really meant." It is equally possible that the jury, convinced of guilt, properly reached its conclusion on one offense, and then through mistake, compromise, or lenity, arrived at an inconsistent conclusion on the other offense. As long as the trial and appellate courts are convinced on independent review that there was sufficient evidence to sustain a rational verdict of guilt beyond a reasonable doubt, the defendant is properly protected against any risk of injustice resulting from "jury irrationality."

*López,* 944 F.2d at 41 (discussing *Powell,* 469 U.S. 57, 105 S.Ct. 471, 83 L.Ed.2d 461) (internal quotations omitted). Accordingly, because we found that Flores–Rivera's conspiracy conviction is supported by sufficient evidence, it must stand.

## E. Prosecutorial Misconduct

Flores–Rivera claims that Agent Tejada's grand jury testimony was replete with perju-

---

accompanied by some effort at developed argumentation, are deemed waived") (collecting cases), *cert. denied,* 494 U.S. 1082, 110 S.Ct. 1814, 108 L.Ed.2d 944 (1990).

**5.** Flores–Rivera also maintains that the indictment is multiplicitous and violates the Double Jeopardy Clause of the United States Constitution because the substantive crimes charged in Counts 3, 4 and 34 are "in fact and in law" identical to the overt acts alleged under the conspiracy Count. This argument falls short for two reasons. First, the Double Jeopardy Clause is not implicated here because Flores–Rivera was acquitted of the substantive crimes charged in the indictment, and therefore the sentencing court did not impose multiple punishments for the same offense. *See Jones v. Thomas,* 491 U.S. 376, 381, 109 S.Ct. 2522, 2525–26, 105 L.Ed.2d 322 (1989) (noting that the Double Jeopardy Clause affords protection against multiple punishments for the same offense imposed in a single proceeding.); *Missouri v. Hunter,* 459 U.S. 359, 366, 103 S.Ct. 673, 678, 74 L.Ed.2d 535 (1983) (noting that "the Double Jeopardy Clause does no more than prevent the sentencing court from prescribing greater punishment than the legislature intended").

Second, the fact that Flores–Rivera's indictment charges both conspiracy and the substantive crimes involved in the conspiracy fails to implicate the Double Jeopardy Clause because it has long been the rule that "a substantive crime, and a conspiracy to commit that crime, are not the 'same offense' for double jeopardy purposes." *United States v. Félix,* 503 U.S. 378, 389, 112 S.Ct. 1377, 1384, 118 L.Ed.2d 25 (1992) (citing *United States v. Bayer,* 331 U.S. 532, 542, 67 S.Ct. 1394, 1399, 91 L.Ed. 1654 (1947) (noting that "the same overt acts charged in a conspiracy count may also be charged and proved as substantive offenses, for the agreement to do the act is distinct from the act itself")); *see also Pinkerton,* 328 U.S. at 643, 66 S.Ct. at 1182 ("[T]he commission of the substantive offense and a conspiracy to commit it are separate and distinct offenses ... [a]nd the plea of double jeopardy is no defense to a conviction for both offenses.").

**6.** Even so, the verdicts are not inconsistent. As explained above, the substantive crime and the conspiracy to commit it are separate offenses. *Callanan v. United States,* 364 U.S. 587, 593, 81 S.Ct. 321, 325, 5 L.Ed.2d 312 (1961).

ry, that the government either cooperated with Agent Tejada or was negligent in allowing him to testify falsely, that this prosecutorial misconduct rose to the level of a due process violation, and that, therefore, the various indictments against him must be dismissed. Specifically, Flores–Rivera claims that Agent Tejada misled the grand jury when he testified (1) that the government's informant, William Cedrés, was a businessman, (2) that Cedrés had been arrested only once, and (3) that Cedrés had infiltrated the defendant's drug organization rather than being recruited by authorities from within the organization and then "flipping" pursuant to a formal cooperation agreement with the prosecution. The district court addressed these issues before trial and found them meritless. In particular, the district court found (1) that Cedrés was indeed a businessman, (2) that at the time of Agent Tejada's testimony, there was only one arrest listed in Cedrés' criminal history, and (3) that no evidence substantiated the allegation that Cedrés had "flipped" pursuant to a formal cooperation agreement.

 In *Bank of Nova Scotia v. United States,* 487 U.S. 250, 108 S.Ct. 2369, 101 L.Ed.2d 228 (1988), the Court provided the applicable standard for determining when errors before the grand jury warrant dismissal of an indictment: "[A]s a general matter, a district court may not dismiss an indictment for errors in grand jury proceedings unless such errors prejudiced the defendants." *Id.* at 254, 108 S.Ct. at 2373; *see also United States v. Latorre,* 922 F.2d 1, 6–7 (1st Cir.), *cert. denied,* 502 U.S. 876, 112 S.Ct. 217, 116 L.Ed.2d 175 (1991). As we explained in *United States v. Valencia–Lucena,* 925 F.2d 506, 511 (1st Cir.1991), errors before the grand jury will often be deemed harmless if the defendants were subsequently and properly convicted before an impartial petit jury:

> [T]he fact that the defendants were convicted by a petit jury acts as a cure for any error which may have resulted during grand jury proceedings. An indictment returned by a legally constituted and unbiased grand jury, if valid on its face, is enough to call for trial of the charge on its merits. A court should not inquire into the sufficiency of the evidence before the indicting grand jury, because the grand jury proceeding is merely a preliminary phase and all constitutional protections are afforded at trial. Once a defendant has been convicted by a petit jury, the petit jury's verdict of guilty beyond a reasonable doubt demonstrates a fortiori that there was probable cause to charge the defendants with the offenses for which they were convicted. At that point, our review is limited to determining if the district court abused its discretion in failing to dismiss the indictments.

*Valencia–Lucena,* 925 F.2d at 511 (internal quotations and citations omitted); *cf. United States v. Osorio,* 929 F.2d 753, 763 (1st Cir. 1991). Here, Flores–Rivera was properly convicted by a petit jury after he and his codefendants were afforded ample opportunity to cross-examine Cedrés at trial. Moreover, Flores–Rivera has not demonstrated that the alleged misconduct in fact occurred, much less that it was prejudicial or outrageous. Accordingly, we find that Flores–Rivera's proper conviction by a petit jury cures any alleged error before the grand jury.[7]

### F. *Evidentiary Matters*

Flores–Rivera maintains that his trial was marred by four evidentiary errors, and that

---

7. Nevertheless, we repeat our prior admonishment against government misconduct, this time in the context of prosecutorial misconduct before the grand jury:

> Before departing from these shores, we pause to add a qualification: the use of supervisory power to dismiss an indictment, in the absence of injury to the defendant, may not be entirely a dead letter. The [Supreme] Court's reasoning in [*United States v. Hasting*] may be read to leave open the possibility that the goal of deterring future misconduct would justify using the supervisory power to redress conduct not injuring defendants if the conduct is plainly improper, indisputably outrageous, and not redressable through the utilization of less drastic disciplinary tools.

*United States v. Santana,* 6 F.3d 1, 11 (1st Cir. 1993) (citing *United States v. Hasting,* 461 U.S. 499, 506, 103 S.Ct. 1974, 1979, 76 L.Ed.2d 96 (1983)).

each constitutes reversible error. We address his contentions in turn.

### 1. "Other crimes" evidence:

■ Flores–Rivera's first contends that the prosecutor improperly elicited inadmissible evidence of "other crimes" from informant Cedrés. Cedrés did allude to the fact that defendant Escobar had spent time in prison. Counsel for Escobar immediately objected and demanded a mistrial. Flores–Rivera joined in this motion. The court denied the defendants' motions for mistrial, issued curative instructions, and admonished the government to keep its questions simple to avoid eliciting further improper testimony. Flores–Rivera insists that the curative instructions were insufficient and that the court erred in not granting a mistrial. We disagree.

Generally, "we will presume that juries can and will follow instructions to disregard inadmissible evidence inadvertently presented." *United States v. Martínez*, 922 F.2d 914 (1st Cir.1991) (citing *United States v. Paiva*, 892 F.2d 148, 160 (1st Cir.1989)). Here, the risk of prejudice to Flores–Rivera was slim because Cedrés alluded only to codefendant Escobar's prison time; Cedrés did not indicate that Flores–Rivera had also served prison time. Moreover, the district court issued a timely and forceful curative instruction, to which neither Flores–Rivera nor Escobar objected.[8] Accordingly, we affirm the district court's refusal to grant a mistrial.

### 2. Pre-conspiracy evidence:

■ Flores–Rivera also contends that the district court erred in admitting evidence that drugs were imported by codefendants Escobar and Santos–Caraballo in March of 1986, one month before the start of the conspiracy alleged in Count 2. Flores–Rivera notes correctly that the evidence was admissible against his codefendants, but not against him. He argues that the court's instruction to this effect was insufficient and confusing. This contention has little merit and can be disposed of quickly.

To prevent prejudice to the other defendants, the district court issued an extensive limiting instruction to the jury, which included the admonishment:

> [T]his evidence will only be considered by you in reference to defendants [Escobar] and [Santos–Caraballo]. This evidence only relates to them. It doesn't relate at all whatsoever to Michael Cruz–González, to Eric Flores–Rivera or to Andrés Morales–Cruz. They are not involved in that. So if you consider this evidence, it pertains only to those two defendants.

This instruction clearly instructed the jury that it was not to consider the pre-conspiracy evidence against Flores–Rivera. Accordingly, we reject Flores–Rivera's contention that the admission of this evidence constituted reversible error.

### 3. Statements of co-conspirators:

■ Flores–Rivera also contends that the district court misapplied the co-conspirator exclusion to the hearsay rule and thus clearly erred when it admitted the out-of-court statements of codefendant Escobar. Federal Rule of Evidence 801(d)(2)(E) excludes from the operation of the hearsay rule "a statement by a coconspirator of a party during the course and in furtherance of the conspiracy." Fed.R.Evid. 801(d)(2)(E). "To invoke the exception, a party who wants to introduce a particular statement must show by a preponderance of the evidence that a conspiracy embracing both the declarant and the defendant existed, and that the declarant uttered the statement during and in furtherance of the conspiracy." *United States v. Sepúlveda*, 15 F.3d 1161, 1180 (1993) (1st Cir.) (citing *Bourjaily v. United States*, 483 U.S. 171, 175–76, 107 S.Ct. 2775, 2778–79, 97

---

**8.** The curative instruction states, in pertinent part:

> ... I have stricken the last statement made by Mr. Cedrés.... You are not to consider it at all during your deliberation.

> [T]he defendants are not on trial today except for whatever is charged in the indictment. And you're not to consider, when deciding the issues of this case, matters that are outside what is charged in the indictment.

> And I'm admonishing the government to keep its questions simple ... so the witness maintains his answer and testimony within the confines of the questions ... so as not to bring in facts which are not alleged in the indictment.

L.Ed.2d 144 (1987); *United States v. Ortiz,* 966 F.2d 707, 714–15 (1st Cir.1992)), *cert. denied,* —— U.S. ——, 114 S.Ct. 2714, 129 L.Ed.2d 840 (1994).

■ Here, the informant, Cedrés, testified that Escobar had told him that Flores–Rivera was a member of the narcotics conspiracy. Flores–Rivera contends that this statement was improperly admitted under the co-conspirator exclusion because it was not made in furtherance of the conspiracy. We disagree. As we have often explained, a damaging statement is admissible under 801(d)(2)(E) if it "tends to advance the objects of the conspiracy as opposed to thwarting its purpose." *United States v. Fahey,* 769 F.2d 829, 839 (1st Cir.1985); *see also United States v. Masse,* 816 F.2d 805, 811 (1st Cir.1987). The evidence shows that Escobar intended to make Cedrés "the number two man in his organization." Clearly, such a person would need to know the identities of the players in the organization, and statements to this end are certainly in furtherance of the conspiracy. *Cf. Sepúlveda,* 15 F.3d at 1180 (explaining that "it is common ground—and common sense—that the reporting of significant events by one coconspirator to another advances the conspiracy") (citing *United States v. Smith,* 833 F.2d 213, 219 (10th Cir.1987)). Accordingly, we find that the district court did not clearly err in admitting the statement under the co-conspirator exclusion to the hearsay rule.

### 4. Identification testimony:

■ Lastly, Flores–Rivera contends that he was prejudiced by the government's use of photo spreads that were allegedly impermissibly suggestive. Although his brief is unclear, he appears to argue that the photo spreads shown to two witnesses were so impermissibly suggestive as to render their subsequent in-court identifications unreliable and inadmissible.

The framework for our appellate review is well settled.

> The Supreme Court, in *Manson v. Brathwaite,* concluded that reliability is the "linchpin" in deciding the admissibility of identification testimony. The Court directed attention to the factors indicating reliability previously set out in *Neil v. Biggers,* [including] the opportunity for the witness to view the defendant at the time of the crime, the witness's degree of attention, the accuracy of his prior description, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation.

*United States v. Fields,* 871 F.2d 188, 195 (1st Cir.) (citing *Manson v. Brathwaite,* 432 U.S. 98, 114, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140 (1977); *Neil v. Biggers,* 409 U.S. 188, 199–200, 93 S.Ct. 375, 382–83, 34 L.Ed.2d 401 (1972)), *cert. denied,* 493 U.S. 955, 110 S.Ct. 369, 107 L.Ed.2d 355 (1989); *see also United States v. Guzmán–Rivera,* 990 F.2d 681, 683 (1st Cir.1993).

Here, Flores–Rivera has not demonstrated how the photo spreads were impermissably suggestive, except to aver generally that Flores–Rivera has different facial characteristics than the other persons featured in the display. The district court judge rejected this same averment at trial, stating that the photo spreads were among the fairest he had seen. Moreover, even if the photo spreads had been impermissibly suggestive, the circumstances indicate that the subsequent in-court identifications were reliable.

Two witnesses testified that they had seen Flores–Rivera purchase aviation fuel at the Isla Grande Flying School on April 14, 1986, the day that the Customs agents were shot. Awilda Torres de Reyes, the owner of the flying school, testified that Flores–Rivera had arrived in a flatbed tanker-truck and purchased over 100 gallons of aviation fuel, an unusually large amount. She stated that it required between one and two hours to complete the transaction, thus giving her ample time to view the defendant. She testified further that the transaction stuck in her mind because the defendant had purchased an unusually large amount of fuel, and that she suspected that the purchase was connected to a drug trafficking scheme because she knew that drug traffickers often required large quantities of aviation fuel. She indicated that the transaction became especially memorable the following day when she read that two U.S. Customs agents had been shot

while investigating a narcotics operation. She called the Customs office and informed them that she had sold a suspiciously large quantity of aviation fuel on the same day as the shooting, and that she thought that the two incidents might be connected. The second witness who identified Flores–Rivera as the April 14 fuel-purchaser was Raúl Jiménez, who was then working as a pilot for the Puerto Rico Department of Justice. He testified that the incident was memorable to him because he was forced to wait for over an hour while Flores–Rivera was filling the tanks on the flatbed truck. Mr. Jiménez also indicated that he contacted Customs agents after he heard rumors that a flatbed tanker truck had been involved in the shooting of two Customs agents on the night of the fuel purchase. Accordingly, the circumstances indicate that the attention of both witnesses was sufficiently focused on Flores–Rivera, both at the time of the viewing and shortly thereafter.

At trial, both witnesses evinced certainty that Flores–Rivera was in fact the April 14 fuel-purchaser. The only troubling factor is that their in-court identifications did not occur until February 23, 1993, nearly seven years after their initial viewing at the flying school. Nevertheless, we find that the other reliability criteria were sufficiently persuasive to overcome any unreliability engendered by the delay. Accordingly, the district court did not err in admitting the identification evidence.

### G. *Sentencing Challenge*

Flores–Rivera contends that the district court improperly determined his appropriate base offense level ("BOL"). The district court determined Flores–Rivera's BOL to be 40 after it concluded that between 500 and 1500 kilograms of cocaine were attributable to Flores–Rivera for sentencing purposes. *See* U.S.S.G. § 2D1.1(c)(2). Flores–Rivera contends that the evidence does not support this conclusion.

■■■■ The determinative factor for sentencing under the guidelines is the quantity of drugs. *United States v. Reyes,* 3 F.3d 29, 31 (1st Cir.1993). That quantity is the sum of the charged conduct for which defendant

is convicted plus his "relevant" uncharged conduct. *United States v. Bradley,* 917 F.2d 601, 604 (1st Cir.1990). "The drug quantity is to be derived from all acts 'that were part of the same course of conduct or common scheme or plan as the offense of conviction.'" *United States v. Garcia,* 954 F.2d 12, 15 (1st Cir.1992) (quoting U.S.S.G. § 1B1.3(a)(2)). In the case of jointly undertaken criminal activity—whether or not charged as a conspiracy—relevant conduct includes all acts reasonably foreseeable by the defendant and committed in furtherance of the jointly undertaken activity. U.S.S.G. § 1B1.3, comment. (n.1); *United States v. Castellone,* 985 F.2d 21, 24 (1st Cir.1993); *Garcia,* 954 F.2d at 15. To include disputed transactions as relevant conduct, the government must prove by a preponderance of the evidence a sufficient nexus between the conduct underlying the disputed transaction and the offense of conviction. *See Castellone,* 985 F.2d at 24; *United States v. Sklar,* 920 F.2d 107, 110 (1st Cir.1990). We accord considerable deference to the district court's determination of whether a given drug transaction forms part of the same course of conduct as counts of conviction and, absent mistake of law, will set aside its finding only if clearly erroneous. *Castellone,* 985 F.2d at 24; *Garcia,* 954 F.2d at 15.

■■■■ Here, the evidence clearly supports the district court's conclusion that between 500 and 1,500 kilograms of cocaine were attributable to Flores–Rivera for sentencing purposes. Cedrés testified that Escobar ordered Flores–Rivera to supervise the importation of between 300 and 500 kilograms of cocaine from Colombia. The district court could reasonably have attributed this quantity to Flores–Rivera for sentencing purposes, and Flores–Rivera concedes as much. Cedrés also testified that the Escobar Organization was conspiring to import approximately 1,500 kilograms of cocaine from Colombia for distribution in New York, and that Flores–Rivera had accompanied Cedrés to look for appropriate "drop zones" on the island of Vieques. From this evidence, the district court could have reasonably concluded that there was a sufficient nexus between Flores–Rivera's conspiracy conviction and the impor-

tation efforts of the other members of the conspiracy to attribute to him between 500 and 1500 kilograms of cocaine for sentencing purposes. Accordingly, we find no error in the district court's determination of Flores–Rivera's BOL.

We have considered the other issues raised by Flores–Rivera and find them to be similarly meritless.

*Affirmed.*